Marvin Berry v. Commissioner. Elizabeth Jane Berry v. Commissioner.
Berry v. Comm'r
Docket Nos. 39393, 39394.
United States Tax Court
T.C. Memo 1956-208; 1956 Tax Ct. Memo LEXIS 80; 15 T.C.M. (CCH) 1106; T.C.M. (RIA) 56208; September 19, 1956
*80 A. P. G. Steffes, Esq., for the petitioners. John J. Burke, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income tax and addition to tax for fraud with intent to evade tax as follows: Marvin Berry
Addition
Year Ended
Deficiency
to Tax
Dec. 31, 1946
$48,669.91
$24,334.95
June 30, 1948
403.01
Elizabeth Jane Berry
Dec. 31, 1946
$15,887.33
June 30, 1948
433.74
*81 The issues are: 1. Did the respondent err in disallowing as a business expense deduction in 1946 the amount of $191.93 which was recorded on the books of Marvin Berry as "taxes, licenses, misc." paid in connection with the purchase of a 1946 Cadillac automobile? 2. Did the respondent err in determining that the petitioners had understated sales in the amount of $20,000 for the year 1946? 3. Did the respondent err in determining that the amount of $8,699.01, expended by Polar Ice Company for material and labor for petitioners' personal residence, represented additional partnership income to the petitioners in 1946? 4. Did the respondent err in determining that petitioners had deducted excessive amounts of depreciation in their returns for both of the taxable years? 5. Did the respondent err in determining the community property income of each petitioner? 6. Did the respondent err in determining that Marvin Berry filed a false and fraudulent return for 1946? Other issues raised by the pleadings have been conceded, and effect will be given to these concessions upon settlement under Rule 50. The parties have stipulated that judicial notice may be taken of the findings *82 of this Court, pleadings, transcript, and other documents, in cases involving deficiencies in income taxes of petitioners for the years 1941 to 1945, inclusive, Dockets 12966, 12983, 13027, 13028, 15647, and 15665. Findings of Fact Petitioners, at all times material herein, were husband and wife and residents of Bakersfield, California. They filed separate income tax returns on a community property basis with the then collector of internal revenue for the sixth district of California for the calendar year 1946, and for the fiscal year ending on June 30, 1948. Marvin Berry (hereinafter referred to as Berry) conducted or participated in three businesses in 1946: A farming operation in Edison (near Bakersfield), California, as a sole proprietorship, under the name Marvin Berry Company; a wholesale produce business in Bakersfield, as a sole proprietorship, called the P-Street business (hereinafter referred to as P-Street); and a frozen foods and cold storage business in Santa Barbara, known as Polar Ice and Cold Storage Company (hereinafter referred to as Polar Ice), a partnership. Separate books and records were kept for Marvin Berry Company, P-Street and Polar Ice at Edison, *83 Bakersfield and Santa Barbara, California, respectively. The P-Street books showed that the business commenced and the books were opened on May 3, 1945, and that business ceased and the books were closed on September 9, 1946. Taxes On December 30, 1946, Berry purchased a 1946 Cadillac automobile from Jack Martin for which he gave his check for $2,094.43, which included $191.93, charged on Berry's books to "taxes, licenses, misc." The total purchase price was $3,294.43, the balance ($1,200) representing credit for a used car that Berry traded in. Petitioners' books did not disclose the type of taxes represented by the expenditure of $191.93. Respondent determined that this amount represented Federal excise and State sales taxes on the purchase of an automobile which should have been capitalized and disallowed the deduction of this amount as an ordinary and necessary business expense. Mettler Pea Deal - $20,000 On March 22, 1946, Berry paid E. H. Mettler $20,000 in cash for a half interest in a pea crop. He used his personal funds to make this purchase. No income was recorded on the books of Marvin Berry Company in 1946 prior to April 1. On that date there was recorded *84 the receipt of $1,875 from the first sale of Mettler peas. A revenue agent engaged in an examination of the books and records of Marvin Berry Company during the latter part of 1950 and early 1951, found that a charge of $20,000 had been made on the books of this company to pea purchases on May 4, 1946, and that a check in the amount of $20,000 had been issued by the company on May 3, 1946, to P-Street. The explanation given for the cash disbursement was "to repay Marvin Co. for the $20,000 cash paid to Emanuel H. Mettler on pea deal". The agent then examined the P-Street books and found that the $20,000 had been credited to a drawing account of Berry on those books, and that it had been deposited in the P-Street bank account as cash received. His examination of the books and records of the Marvin Berry Company and P-Street failed to disclose the source of the $20,000. He asked Berry where it came from, and Berry replied: "I don't know where it came from. What difference does it make? I have always got places to dig up cash." The revenue agent had theretofore made investigations of the returns of Berry for the years 1941 to 1945, inclusive, and in the course of these investigations *85 had found that Berry had engaged in black market transactions and had unreported income in two of these years. In 1946, when the agent was making an examination covering the years 1944 and 1945, Berry admitted to the agent that he was then selling produce at P-Street at overceiling prices and that he was billing the goods so that the O.P.A. could not discover that he was making these sales. When the agent could not trace the source of the $20,000 he decided that it was derived from unreported sales in 1946 and in his report recommended that it be added to the income reported by petitioners in that year. The Commissioner followed the recommendation of the agent in determining the deficiencies. In proceedings in this Court relating to deficiencies determined against petitioners for the years 1941 through 1945, this Court found: "* * * Berry maintained several checking accounts in banks in Bakersfield and Los Angeles, California. He also maintained the safe deposit box, above referred to, in a bank at East Bakersfield. Both petitioners had access to this box during the years 1943 through 1945. Berry at times kept large amounts of cash in this safe deposit box. He also had an iron *86 safe and a filing cabinet at his office at Edison, in both of which he kept considerable cash in 1943. In addition, Berry had a combination safe at his home where he kept a substantial sum of money. He sometimes carried a large amount of money on his person. During certain of the years involved herein Berry sold his produce at prices in excess of those established by the Office of Price Administration. Many such transactions were not recorded on his records or the records thereof were destroyed. In order to sell his produce above price ceilings Berry made sales directly to customers in his fields. Another method used in selling above ceiling prices was to ship, by agreement with the customers, less produce than the quantity for which those customers purportedly had paid." On February 16, 1945, Berry sold all of his available assets and deposited the proceeds of the sales plus all of his available cash on hand in the Bank of America, East Bakersfield Branch. Two deposits were made on that date, one aggregating $48,108.88 and the other $10,000. Of the first deposit, $24,323.07 was a cash deposit. The $10,000 deposit and a portion of the $48,108.88 deposit represented proceeds from *87 the sale of two bonds. In proceedings involving the years 1941 to 1945, inclusive, this Court held that the amount of $48,108.88 deposited on February 16, 1945, was unreported income of the petitioner in 1945. Berry did not inherit or receive any gifts of money during 1946 or in previous years. Polar Ice Income Polar Ice & Cold Storage Company (hereinafter referred to as Polar Ice) was a partnership engaged in carrying on a frozen foods and cold storage business in Santa Barbara, California. Louis B. Clift was the general manager of the business. The Articles of Co-Partnership, executed February 27, 1945, provided in part that the four equal partners, Marvin E. Berry, Andrew J. Berry, Louis B. Clift and Harry S. Ricks, were to commence business on March 1, 1945; that the contribution of capital of each partner was to be $11,000; that the partners were to share equally the profits and losses of the business; that any sums drawn other than salary, by any partner, were to be charged to the partner, and upon an accounting, were to be considered as a portion of the partner's share of the profits; and that upon dissolution of the partnership by death or withdrawal of a partner, *88 the remaining partners, or any one or more of them, could purchase the interest of the withdrawing or deceased partner and succeed to the interest and right of the withdrawing or deceased partner. On April 30, 1946, Harry S. Ricks and Andrew J. Berry withdrew from the partnership and the original partnership was dissolved. Each of the retiring partners agreed to accept $11,000 in full payment for his interest in the property, assets, capital, credits, effects and good will of the business, and Marvin Berry purchased their interests in the partnership. Thereafter it continued to operate as a partnership composed of Marvin Berry, who owned a 75 per cent interest, and Louis B. Clift, who owned the remaining 25 per cent interest. Polar Ice operated on a fiscal year basis, ending June 30. It filed a partnership return of income (Form 1065) for the period March 1, 1945 to June 30, 1945, and reported a net loss of $5,435.80. No partnership return was filed for the year 1946. Polar Ice paid to Charles M. Urton and Kenneth C. Urton, building contractors, $3,485.55 by its check dated January 4, 1946, and $5,213.46 by its check dated June 18, 1946. Both checks were signed "Polar Ice & Cold *89 Storage Co. by Louis B. Clift." Polar Ice used voucher form checks and the voucher part of the $3,485.55 check carried the explanation "Produce a/c" and of the $5,213.46 check "maintenance and repairs, labor and material." In the latter part of 1950 or early part of 1951, a revenue agent made an examination of the books of Polar Ice for the purpose of ascertaining whether Marvin Berry had any income from that company which he did not report in his 1946 income tax return. His examination disclosed that the checks for $3,485.55 and $5,213.46 were charged on the Polar Ice books to the raw produce and frozen foods account, and that there were about fourteen other checks payable to the Urton firm charged to building additions or repairs. During the year 1946 the Urton firm was engaged in building a personal residence for Berry at Santa Barbara and also in making some building additions and repairs for Polar Ice. The agent examined the books of the Urton firm and found that the checks for $3,485.55 and $5,213.46 were credited thereon to Berry personally and were in payment for labor and materials furnished by the Urton firm in connection with erection of the Santa Barbara residence. *90 In the course of his investigation the revenue agent found a copy of a Polar Ice partnership information return (Form 1065) for the year ended June 30, 1946, in the file of an accountant employed by that company to audit its books and prepare the return. He also found the original of this return, which had not been filed, in the office of Marvin Berry. The net income shown on the return was $23,654.95, and the partners' shares of this income entered thereon were $17,741.21 for Marvin E. Berry and $5,913.74 for Louis B. Clift. The amount of the net income shown on the return agreed with the amount shown on the Polar Ice books. However, the agent discovered that the amounts of the two checks, totalling $8,699.01 had been deducted in arriving at the net income figure of $23,654.95. In Berry's income tax return for 1946, he reported his distributive share of the income of Polar Ice for its fiscal year ended June 30, 1946, to be $17,741.21, and each of the petitioners reported his or her community one-half of this amount in the returns for 1946. The revenue agent in his report to the director of internal revenue added the $8,699.01 to the distributive share of Polar Ice income reported *91 by Berry, thus increasing his distributive share to $26,440.22. In the notices of deficiencies, the respondent determined that Berry's distributive share of the partnership net income was $26,440.22, instead of $17,741.21, and added one-half of the difference of $8,699.01 to the community income reported by each of the petitioners in their 1946 returns. Depreciation - 1946 Petitioners deducted $11,646.67 for depreciation in their 1946 returns; respondent allowed $6,991.07 as reasonable depreciation, and disallowed $4,655.60, as being excessive. Petitioners contest the disallowances made by the respondent on the following items of depreciable property: Farm Equipment The petitioners and the respondent used a composite rate in determining the amount of depreciation allowable in 1946 on petitioners' farm equipment, which had a cost basis of $32,988.51. The petitioners determined that the average useful life of all of the equipment was five years, and in their 1946 returns claimed a deduction for depreciation of $6,597.70. The respondent determined that the average useful life of the equipment was ten years, allowed $3,298.85 and disallowed $3,298.85 of the amount claimed by *92 petitioners. The equipment included various kinds of farm equipment, both manual and mechanized, such as tractors (both wheeled and caterpillar), potato planters, discs, and plows. Berry used this equipment in farming in the Edison area, where crops are harvested practically twelve months of the year. The soil is sandy and is "hard" on the equipment. Berry planted peas in the fall of the year and harvested them after the following March 20th or 25th. He planted sweet corn in the spring and harvested it in June or thereabouts. He planted melons in the spring and harvested them in the middle of July or early August, on through until Christmas, when the frost came. He planted tomatoes which he harvested about Christmas time, and he finished harvesting cotton about the same time. He often employed double shifts and worked some of the equipment twenty-four hours a day. Berry expended substantial amounts for the repair and maintenance of the farm equipment and thus kept it in good condition. When he sold some of the equipment, he realized a profit. A reasonable allowance for depreciation of petitioners' farm equipment during 1946 is $3,298.85. Farm Buildings Petitioners used *93 a ten-year period in taking depreciation on frame farm buildings, having a cost basis of $13,238.45, and ducted $186.16 therefor in their 1946 returns. Respondent, using a twenty-year period, allowed $661.92, and disallowed $661.93. The farm buildings consisted of six frame buildings. Two were on the land when Berry purchased it in 1941 and one of them was about forty years old. The four remaining buildings were placed on the property between 1941 and 1946. One of the four was built by Berry and the other three were moved in from other locations. All of the buildings were used mostly to house transient farm workers who subjected them to hard usage. All of the buildings were in use in 1955 and Berry intends to continue to have them occupied by farm workers. A reasonable allowance for depreciation of the farm buildings for 1946 is $661.92. Machinery Sheds Petitioners used a ten-year period in taking depreciation on machinery sheds, having a cost basis of $1,861.61, and deducted $186.16 therefor in their 1946 returns. Respondent, using a twenty-year period, allowed $93.08, and disallowed $93.08. In making his examination and investigation the revenue agent did not ascertain whether *94 the buildings were old or new when Berry acquired them. A reasonable allowance for depreciation of the machinery sheds in 1946 is $93.08. Bohemian Building Petitioners used a twenty-five-year period in taking depreciation on the Bohemian Building in Bakersfield, having a cost basis of $18,900, and deducted $778.07 therefor in their 1946 returns. Respondent, using a forty-year period, allowed $472.50 and disallowed $305.57. When Berry acquired the building in 1945, it was then five or ten years old. The building is constructed partly of brick and partly of wood with a tar paper roof. Part of the building is of sheet metal construction, and the garage is of wood, sheet metal construction. The building was and is still being used by the Bohemian Brewing Company. The revenue agent, upon whose report the adjustment increasing the estimated useful life of the building was based, inspected the building from the outside; he did not know, when he made his report, how old the building was when Berry acquired it. A reasonable allowance for depreciation of the Bohemian Building in 1946 is $472.50. Vegetable Wagons Petitioners used a four-year period in taking depreciation on vegetable *95 wagons, having a cost basis of $1,572.29, and deducted $393.08 therefor in their 1946 returns. Respondent, using a ten-year period, allowed $157.23, and disallowed $235.85. Berry built these vegetable wagons out of used boiler pipe from the junk yards at a time when it was impossible to secure anything new. They were built for the specific purpose of hauling tomatoes from the field. Berry used them about two or three years, and then ceased using them ("junked" them) because they were practically worn out. A reasonable allowance for depreciation of the vegetable wagons in 1946 is $393.08. DEPRECIATION - 1948 Petitioners deducted $18,584.59 for depreciation in their returns for the fiscal year ending June 30, 1948. Respondent allowed $14,936.53 and disallowed $3,648.06. Petitioners contest the disallowance made by respondent on the following items of depreciable property: Bohemian Building Petitioners used a twenty-five-year period preciation in their returns for the fiscal in taking depreciation on the Bohemian Building, having a cost basis of $18,900, and deducted $756 therefor in their returns for the fiscal year ending June 30, 1948. Respondent, using a forty-year period, *96 allowed $472.50 and disallowed $283.50. A reasonable allowance for depreciation of the Bohemian Building for the fiscal year ending June 30, 1948, is $472.50. Farm Buildings Petitioners used a ten-year period in taking depreciation on frame farm buildings, having a cost basis of $37,468.98, and deducted $3,746.52 therefor in their returns for the fiscal year ending June 30, 1948. Respondent, using a twenty-five-year period (instead of twenty years, as he did in 1946) allowed $1,498.76 and disallowed $2,247.76. Subsequent to 1946 additional farm buildings were acquired. Respondent determined that these acquisitions increased the life of the group in using the composite rate. A reasonable allowance for depreciation of the farm buildings for the fiscal year ending June 30, 1948, is $1,498.76. Water Wells Petitioners used a ten-year period in taking depreciation on water wells, having a cost basis of $13,816.90, and deducted $1,381.83 therefor in their returns for the fiscal year ending June 30, 1948. Respondent, using a twenty-year period, allowed $690.85 and disallowed $690.98. The soil in the Edison district is sandy and the water that comes from these wells has chemicals *97 in it that make the well casings rot. Berry had wells that collapsed and he had to drill them in other places. A reasonable allowance for depreciation on water wells for the fiscal year ending June 30, 1948, is $690.85. COMMUNITY PROPERTY Marvin Berry and Elizabeth Jane Berry were married on August 30, 1941, and at that time entered into an oral agreement that everything they had would be divided "fifty-fifty" during the existence of their marriage. On August 30, 1941, Marvin Berry's net worth was $34,299.45. After their marriage, and until their divorce in 1951, Marvin Berry never segregated any property, which he owned when married, as being his separate property; and never at any time claimed that he had any separate property in which his wife had no interest. He never, during their married life, showed any separate property or separate income on any of his books, and always reported all income as community income. When petitioners were divorced in 1951, they executed a property settlement agreement, and all property, of every kind, was included therein and treated as community property. Respondent, in adjusting the net income of Marvin Berry for the year 1946, treated *98 part of the income as separate income and part of it as community income, making allocations in accordance with the formula approved in Clara B. Parker, 31 B.T.A. 644, 655-658. All of the property and net income of Marvin Berry in 1946 was community property and income. Opinion RAUM, Judge: 1. In 1946 Marvin Berry purchased a new Cadillac automobile, the total purchase price of which was $3,294.43. In payment therefor he gave his check for $2,094.43 and a used car for which he received a credit of $1,200. The $2,094.43 payment included $191.93, which amount was charged on Berry's books to "taxes, licenses, misc.". The respondent determined that this amount represented Federal excise and state sales taxes on the purchase of an automobile; that it was not properly deductible as a business expense; and that it constituted additional cost of the automobile which should have been capitalized. The petitioners have not shown what portion of the amount of $191.93 represents Federal excise taxes and what portion represents state sales or license taxes. Any part thereof attributable to Federal excise taxes should have been capitalized and was properly disallowed by the *99 respondent as a deduction. See Sections 3403 and 3448, Internal Revenue Code of 1939; Shearer v. Commissioner, 48 Fed. (2d) 552, 554 (C.A. 2); George E. Hamilton, 6 B.T.A. 240, 241; Section 29.23(c)(2), Regulations 111. The respondent also properly disallowed the deduction of any part of the $191.93 attributable to state sales taxes. The California sales tax is imposed on retailers. Section 6051, California Revenue and Taxation Code. Any such tax paid by the petitioners was a part of the cost of a capital asset purchased for business use, and the entire cost should have been capitalized, as respondent determined. Cf. I.T. 2733, XII-2, Cum. Bull. 46; I.T. 3909, 1948-1 Cum. Bull. 34; I.T. 3937, 1949-1 Cum. Bull. 57; I.T. 3983, 1949-2 Cum. Bull. 31; I.T. 4004, 1950-1 Cum. Bull. 35. In the absence of any convincing evidence that a part of the $191.93 was expended for state license taxes, and the amount so expended, no deduction can be allowed for such an expense. 2. On March 22, 1946, Berry paid E. H. Mettler $20,000 in cash for a half interest in a pea crop. A revenue agent discovered this transaction *100 in the latter part of 1950 or early part of 1951, and made an unsuccessful effort to find the source of the $20,000 which Berry had paid to Mettler. He knew that in some years prior to 1946, Berry had had some income from black market transactions which was not reported in his returns. Also, Berry admitted that he engaged in black market operations in 1946. When an examination of the books and records of the Marvin Berry Company and P-Street failed to disclose the source of the $20,000, and Berry told him he did not know where it came from, the agent concluded that it was derived from unreported sales in 1946, and in his report he added the $20,000 to the net income reported by petitioners in their returns for that year. The respondent made the same adjustment in determining the deficiencies. The burden was on the petitioners to establish that the $20,000 in cash used by Berry in 1946 to purchase the Mettler pea crop did not constitute unreported income received during that year. They contend that the $20,000 came from cash accumulated by Berry prior to 1946, and that the respondent erred in including it in their taxable income for 1946. Berry testified that he did not have the *101 money in the business on March 22, 1946, to purchase the crop of peas; that he wanted to buy this crop; that he had $20,000 at home and got this money and paid Mettler cash for the peas; that he kept money in the safe at his office or at home; that he had a safe deposit box at the Bank of America in East Bakersfield, but did not remember exactly when he had this box; that any cash he collected was kept either in a safe in his office or at home, or in the safe deposit box in the East Bakersfield bank, or in his pocket; that he did not remember from which of these places he got the $20,000; that in the five years prior to 1946 he had cash on his premises at all times which he used for smaller deals; that he did not remember how much cash he had at the time of the purchase but knew that he had $20,000; that he kept no record of this cash; that he knew that the $20,000 came from money that he had accumulated prior to 1946; that he did not know exactly how much cash he had in addition to the $20,000 at the beginning of 1946; that he had some Bank of America securities which he sold for $20,000 within four years prior to 1946 and took the proceeds home; and that the $20,000 expended in 1946 *102 had its source in the proceeds of the sale of these securities and "other additions I drew or got from my business in one manner or another." He also testified that the only sources from which he obtained money between January 1 and March 22, 1946, were the Polar Ice, P-Street, and Marvin Berry Company businesses; that no part of the $20,000 which he paid to Mettler was received from the sale of any merchandise or from anyone in 1946; and that he did not inherit or receive a gift of any money in that year. On February 16, 1945, Berry made two deposits in the Bank of America, East Bakersfield Branch, one aggregating $48,108.88 and the other $10,000. Of the first deposit, $24,203.07 represented a cash deposit. When asked about this cash deposit, Berry testified as follows: [1]
"Q. Where did it come from? "A. I had to scrape every penny in bonds, cash, or otherwise, sell everything and scrape everywhere to get all I could. I put it all right there. I don't know where I got it, but I got it. "Q. Have you got any records of sales of these things you are talking about? "A. I don't know. I got the money and put it in the bank to straighten it all up with." *103 Petitioners state on brief that the $48,108.88 deposit would furnish an ample source from which the $20,000 was derived. But there is no evidence that the $20,000 came from the account in which this deposit was made. And Berry's testimony as to the source of this money is not enlightening. In the latter part of 1950 or early part of 1951 he told the revenue agent he did not know where it came from. At the trial of these proceedings his self-serving testimony was that it came from cash which he had accumulated in various places prior to 1946. He had no records showing how and when this cash was accumulated. He did not know the amount of accumulated cash he had at the end of 1945. When pressed by the Court for an estimate, he said he had approximately $40,000 or more at that time. His above-quoted testimony in the proceedings involving the years 1941 to 1945, inclusive, indicates that he exhausted his supply of cash when he made the $48,108.88 deposit on February 16, 1945. Obviously, therefore, if he had $40,000 or more on January 1, 1946, he must have obtained it in some undisclosed manner between February 16, 1945 and January 1, 1946. After a careful consideration of all of the *104 evidence, our conclusion is that the petitioners have not sustained their burden of proving that the $20,000 used to purchase the Mettler pea crop in 1946, did not represent unreported income received by Berry in that year. 3. In determining the deficiencies the Commissioner added $8,699.01 to Berry's 1946 income from his partnership interest in Polar Ice. This additional amount represents the aggregate of two checks, one for $3,485.55 dated January 4, 1946, and the other for $5,213.46 dated June 18, 1946, which were issued by Polar Ice to a firm of contractors and charged on its books to its raw produce and frozen foods account. The checks, however, were in fact used to pay for material and labor on a personal residence which the contractors were building for petitioners. The effect of these incorrect bookkeeping entries was to give Polar Ice improper deductions with respect to these checks and thus to understate the income of Polar Ice in those amounts. Respondent contends that the entire $8,699.01 must be charged to petitioners. Cf. North American Oil Consolidated v. Burnet, 286 U.S. 417; Healy v. Commissioner, 345 U.S. 278. However, we think that *105 the problem may not be solved so easily by relying upon the claim of right doctrine that was applied in those cases. For, we are dealing here with partnership income, and, under our tax laws, a partner is chargeable with his distributive share of the income of the enterprise regardless of the amounts actually distributed to him. Of course, variations from a predetermined scale of distribution, acquiesced in by the partners, may indicate a new and different system of distribution that will be given effect taxwise, cf. J. C. Nichols, 42 B.T.A. 618, 626-627; but the evidence here is to the effect that the charging of the two checks to the produce and frozen foods account was a bookkeeping error, accomplished without intention of permitting Berry to withdraw more than his share of net income permitted under the partnership agreement. That evidence was not strong, and we have some doubts as to credibility; however, we think that on the whole the scales tip in petitioners' favor in this respect, and we shall therefore proceed upon the assumption that there was no acquiescence by the *106 other partners to any greater distribution of partnership income to Berry than was permissible under the partnership agreement. Accordingly, we must determine the tax consequences to Berry based upon his distributive share of the income of the enterprise. Polar Ice conducted its business on a fiscal year basis beginning July 1. Berry had a twenty-five per cent interest in the business until April 30, 1946, when he bought out two other partners, thereby becoming the owner of a seventy-five per cent interest for the remaining two months. The two checks in question were given in different periods, the first one, in the amount of $3,485.55, in January 1946, and the second, in the amount of $5,213.46, in June 1946. To correct the improper bookkeeping treatment of the first check, it must be restored to income of Polar Ice for the ten-month period ending April 30, 1946, with the consequence that Berry's distributive share must be increased by one-fourth of that amount. Similarly, the second check must be restored to income of Polar Ice for the two-month period ending June 30, 1946, thereby resulting in increasing Berry's distributive share by three-quarters of the amount of that check. *107 [2]
4. The respondent made some adjustments in the amounts claimed by petitioners for depreciation on various items of depreciable property in their returns for the year 1946 and for the fiscal year ended June 30, 1948. The adjustments in issue are based solely upon increasing the useful life of the categories of property involved. Our findings have resolved the controversy as to one of these, namely, vegetable wagons, in favor of the petitioner. As to this category, our findings reflect our conclusion that petitioners have carried their burden of proving that the useful life used by them in their returns was correct; as to the remaining items in controversy, we *108 have concluded that petitioners have failed to prove that the Commissioner's determination was in error. 5. The next issue relates to certain adjustments made by the respondent to the net income reported by petitioners on a community property basis. These adjustments were based upon the use of the so-called Parker formula, which was approved and applied in Clara B. Parker, 31 B.T.A. 644, 655-658. It has no application except in instances where a husband is engaged in business in which his separate capital and his personal services contribute to the profits, and it is necessary to determine the portion of the profits attributable to his capital investment, which is his separate income, and the portion attributable to his personal services, which is community income. See George W. Van Vorst, 7 T.C. 826, 831. In Marvin Berry, Memo. Opinion (April 3, 1952), Dockets 12966, 13028, 15647, 12983, 13027, 15665 [11 TCM 301,], this Court, in determining the tax liability of petitioners for the years 1941 through 1945, was not convinced that there was an oral agreement between Berry and his wife that his separate property at marriage would be treated *109 as community property. In those proceedings, as in the instant proceedings, Berry testified that he and his wife entered into such an agreement, and the evidence disclosed that after their marriage all of their property and income was consistently treated as community property. In the instant proceedings additional evidence has been submitted which convinces us that full credence should be given to the testimony of Berry as to the existence of the oral agreement. This evidence consists of a property settlement agreement executed when petitioners were divorced in 1951. In that agreement all property of Berry and his wife was treated as community property. After considering all of the evidence submitted in these proceedings and the prior proceedings, we have reached the conclusion that any separate property which Marvin Berry had at the time of his marriage was then transmuted into community property and that all property used in his business thereafter and in 1946 was community property. Cf. Kenny v. Kenney, 220 Cal. 134, 30 P. 2d 398; In re Watkins' Estate, 16 Cal. 2d 793, 108 P. 2d 417. We do not, therefore, have an instance where separate capital contributed *110 to profits and requiring a determination of the portion of such profits attributable to the use of such capital. All of Berry's net income for 1946 was community income, and the respondent erred in including more than one-half of this income in his taxable income for that year. 6. The remaining issue relates to respondent's determination that part of the deficiency determined against Marvin Berry for the year 1946 was due to fraud with intent to evade tax, and that he is liable for a 50 per cent addition to tax under Section 293 of the Internal Revenue Code of 1939. In Drieborg v. Commissioner, 225 Fed. (2d) 216, 218 (C.A. 6), the Court of Appeals said: "That the difference in the burden of proving ordinary tax deficiencies and civil fraud can have important practical results has long been recognized. 'As to the issue raised by [the Commissioner's] determination of fraud the burden is upon him; and he may fail to sustain such burden, notwithstanding the determined and presumed error in the return. In other words, both parties may fail through inadequate proof on their several issues, and thus the deficiency would be sustained and the penalty set aside.' L. Schepp Co., 25 B.T.A. 419, 437. *111 'The failure of the taxpayer to overcome the presumptive correctness of the deficiency, as is true in the case at bar, does not create a presumption of fraud. Both parties in a proceeding of this nature may fail through inadequate proof on the several issues.' Sol Gross [8 TCM 928,], Para. 49, 254 P-H T.C. Memo., Docket No. 15004, 10-11-49. See Gus S. Pancol [12 TCM 218,], Para. 53072 P-H T.C. Memo., Docket No. 32383, 3-5-53; Max Cohen, 1947, 9 T.C. 1156, 1163; Snell Isle, Inc. v. Commissioner, 5 Cir., 1937, 90 Fed. (2d) 481, 482; Bryan v. Commissioner, 5 Cir., 1954, 209 Fed. (2d) 822, 825." We are here confronted with a situation where, in our opinion, neither party has carried its burden. We have held that petitioners have not proved that the respondent erred in treating the $20,000 expended by Berry in connection with the Mettler pea deal as unreported income received by Berry in 1946, or that the respondent erred in making an addition to the distributive share of the net income of Polar Ice partnership reported by Berry because of the erroneous deduction of $8,699.01 in computing the net income of the *112 partnership. These are the transactions upon which the respondent relies in support of his contention that part of the deficiency determined against Berry was due to fraud with intent to evade tax. But the failure of petitioners to prove error in respondent's determinations in so far as they relate to these two transactions does not create a presumption of fraud, and after a careful examination of all of the evidence we cannot find that the respondent has sustained his burden of proving by clear and convincing evidence that either the omission of the $20,000 or of a portion of Berry's distributive share of the partnership net income was due to fraud with intent to evade tax. We hold, therefore, that Marvin Berry is not liable for any addition to tax for fraud. Decisions will be entered under Rule 50. Footnotes
1. This testimony was given in proceedings involving deficiencies asserted against petitioners for the years 1941 to 1945, inclusive.↩
2. Petitioners also raise the question, for the first time on brief, that the $17,741.21 actually reported by them as the distributive share of income of Polar Ice should similarly be split up according to the periods in which Berry had a one-quarter and three-quarters interest. This issue is raised too late. Moreover, there is nothing in the record to prove when the income thus referred to was earned by Polar Ice, and petitioners therefore haven't shown any error in the Commissioner's determination in this respect.↩